IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICK MULLEN,<br><br>Plaintiff,<br><br>v.<br><br>MSA SAFETY, INC.,<br><br>Defendant. | Case No. 2:21-cv-188<br><br>JURY TRIAL DEMANDED |

**AMENDED COMPLAINT**

NOW COMES Plaintiff, Patrick Mullen, by and through his attorney, David M. Manes, Esq., of Manes & Narahari LLC, and files this Amended Complaint alleging as follows:

**I. Nature of the Action**

1.  Plaintiff brings this Complaint to recover damages under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.,* and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* Plaintiff alleges that he was subjected to severe and pervasive instances of sexual harassment perpetrated against him by his supervisor. After he reported the unlawful conduct, Plaintiff asserts that he was retaliated against and denied a reasonable accommodation as a result of the anxiety that he developed surrounding the instances of

harassment. Finally, Plaintiff alleges that he was subjected to retaliation for utilizing protected leave in order to participate in medical treatment.

## II. Jurisdiction and Venue

2. This action arises under the Title VII, the ADA, and the FMLA. This Court has jurisdiction over Plaintiff's discrimination claims pursuant to 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4. Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania. The venue is proper pursuant to 28 U.S.C. § 1391(b).

5. Plaintiff filed a timely charge with the Equal Employment Opportunity Employment Commission ("EEOC") regarding his allegations under Title VII on September 9, 2020, under charge number 533-2020-02128. *See Exhibit 1*.

6. Plaintiff was mailed Notice of Right to Sue from the ("EEOC") on December 15, 2020. This Complaint has been filed within ninety days of the Plaintiff's receipt, thus making this action timely. *See Exhibit 2*.

## III. Parties

7. Plaintiff, Patrick Mullen ("Mullen"), is an adult individual with a primary residence located at 7642 Big Beaver Boulevard, Wampum, PA 16157.

8. Defendant, MSA Safety, Inc ("Defendant") is a Pennsylvania business corporation with a regular place of business located at 1000 Cranberry Woods Drive, Cranberry, PA 16066.

## IV. Facts

9. Mullen began working for Defendant on September 17, 2012. His most recent role with the company was that of Group Leader, which required that he act as a shift supervisor, handle inventory, and engage in various other management-related duties.

10. Muller was a productive employee, and he successfully worked in his position with Defendant for eight years. He enjoyed his job, and he was well liked by members of the company's staff and management team.

11. However, toward the end of 2019, Mullen began to experience instances of sexual harassment perpetrated against by his supervisor, Mitch Soman ("Soman").

12. Specifically, Soman began to refer to Mullen as a "fag," a derogatory term used to describe homosexual men. Additionally, Soman grouped Mullen with two other employees – Kyle Harn ("Harn") and Harry Cornelius ("Cornelius") – and labeled them as "butt buddies" and "whiney bitches." Both of these terms were derogatory and offensive.

13. Soman, on several occasions, stated that Mullen, Harn, and Cornelius were "playing grab-ass with each other" and implied that they were "butt buddies who were fooling around."

14. On several occasions, Soman stated that the men were engaging in "a circle jerk."

15. All of these terms were sexually-charged and inappropriate for an employment environment.

16. Soman's comments made Mullen extremely uncomfortable.

17. As a result, in mid-February 2020, Mullen met with Margie Woods, a member of Defendant's Human Resources ("HR") Department. He reported all instances of harassment lobbed against him by Soman.

18. Upon the conclusion of his report, Woods dismissively stated: "What do you want me to do about it?" Mullen took this to mean that Woods had no intention to intervene with the workplace harassment.

19. That same day, Mullen met with Defendant's Production Manager, Shane Livingston ("Livingston"), and reported that Soman had made inappropriate statements to him. Livingston responded by stating that he did not want to know what Soman said, and he told Mullen that he needed to get along with Soman because he was his supervisor.

20. After this conversation, Mullen noticed that Soman was excessively rude and abrasive with him. Mullen assumed that Livingston disclosed his report of harassment to Soman.

21. Toward the end of February 2020, Mullen asked Livingston for a letter of recommendation so that he could apply for a promotion within Defendant's corporate structure or search for a new job outside of the company. Livingston agreed and requested that Mullen send him his resume.

22. Shortly thereafter, Livingston sent Mullen an email which stated that he should be grateful for Defendant, implying that he would be leaving behind a great job if he sought outside employment.

23. Later that week, Livingston approached Mullen and told him that he needed to get his priorities straight. Livingston further stated that, in order to get promoted within the company, Mullen would need to go back to school to achieve a Bachelor's Degree. Mullen indicated that the Production Supervisor position, which he sought, only required an Associate's Degree. Livingston agreed but stated that he would only consider those candidates with a Bachelor's Degree.

24. In response, Mullen stated that he felt that it was discrimination to advertise that the job required a lesser degree than desired. He further indicated that he would like to file a grievance in response.

25. Soon thereafter, Mullen's application for the Production Supervisor position was rejected.

26. All the while, Soman continued to harass Mullen. The constant barrage of inappropriate comments wore on Mullen, and, as a result, he sought a two-week bout of short-term disability through the FMLA to cope with his work-based anxiety. His short-term leave began on March 17, 2020.

27. When Mullen returned, Soman began to harass him regarding his reason for taking leave. Soman stated, sarcastically, to Mullen: "Is your head good? Did you get your head right?"

28. In April 2020, two of Defendant's employees were asked if they wanted to travel to the company's Jacksonville Plant in North Carolina.

29. Mullen, who had seniority over one of the two employees, inquired as to why he wasn't asked to go on the trip. Soman stated: "Do you deserve anything here? You can't even come to work." This comment was in reference to Mullen's use of short-term disability leave through FMLA.

30. Around this same time, Soman told Mullen that he needed to start coming in early and working late. Mullen was regularly scheduled to work from 3 p.m. until 11:30 p.m., and he usually arrived to his shift at approximately 2:30 p.m. Soman told him that he needed to arrive earlier.

31. Mullen disclosed this directive, as well as the instances of harassment, to Michelle Monroe ("Monroe"), a member of the company's HR Department. Mullen was informed that Soman was incorrect, and that he did not have to work outside of his scheduled hours.

32. However, as a result of this conversation with a member of the HR Department, Soman became agitated with Mullen. He permitted and witnessed other employees accuse Mullen of failing to come to work as a result of the two-weeks of short-term disability that he had taken.

33. Soman began to put more and more tasks on Mullen's workload, isolating him from other group leads. Eventually, Mullen told the facility nurse, Jackie Zickefosse ("Zickefosse"), that he was feeling overwhelmed and extremely anxious as a result of the work-related stress.

34. On June 25, 2020, Mullen was hospitalized due to a panic attack. When he returned to work for his next shift, he notified Zickefosse of his hospitalization.

35. On July 7, 2020, Soman accused Mullen of being "whiney" regarding his feelings of being overwhelmed. He further accused Mullen of not caring about his department and letting down his coworkers. Mullen repeatedly asked Soman to leave him alone, which he refused. Soman told Mullen to "quit the act."

36. The conversation was extremely hostile and aggressive.

37. Mullen contacted Zickefosse to report symptoms of a panic attack.

38. About five minutes later, Mullen was called into the HR Department where he was informed that he was required to go home to quarantine, in light of the Covid-19 pandemic, because he had traveled to North Carolina. He was told that the leave would not be paid. When he asked if he could file for unemployment compensation, HR Representative Ashley Holman ("Holman") stated to Mullen: "That's not my problem."

39. During his quarantine, Mullen extended his leave through use of short-term disability leave through FMLA in order to cope with his anxiety.

40. During this time, he formally filed a grievance regarding the sexually-charged comments made to him by Soman.

41. Upon his return to work on August 11, 2020, Mullen was pulled into a meeting with Livingston, Holman and Plant Manager Gail Slater ("Slater"). Mullen was informed that he was going to be placed on a Performance Improvement Plan ("PIP") and that his work would be monitored until September 15, 2020. Further, he was told that if he failed to improve to Defendant's standards, he would be terminated.

42. When Mullen mentioned his struggles with Soman, he was told that management did not want to hear about it.

43. About a week later, on August 17, 2020, Livingston and Holman pulled Mullen into another meeting to ask why he worked for the company. Mullen stated that he worked for the company in an effort to earn a paycheck to support himself and his family. Livingston responded by stating: "If you are here only for a paycheck, why don't you leave the company."

44. He was, again, told that management did not want to hear his complaints about Soman's sexual harassment.

45. Mullen then requested a transfer to a different department. Holman stated that the only way for him to be moved to a different department would be to have his doctor fill out paperwork regarding the ADA. Mullen requested the paperwork.

46. Mullen's next performance meeting with Livingston and Slater occurred during the third week of August 2020, during which Mullen, again, expressed that he was overwhelmed with work and extremely anxious as a result of his reporting to Soman.

47. Mullen reiterated the sexual harassment complaints that he had previously made to the HR Department. Slater stated that she would follow-up with members of the HR Department.

48. Felling the symptoms of a panic attack, Mullen when to Zickefosse, the facility nurse. At this time, she provided him with paperwork regarding the workers' compensation program. Mullen then filled out the appropriate paperwork.

49. Soon after, management proposed a new schedule wherein Soman would work until 3 p.m. and Mullen would start at 3 p.m. so that the two would not be required to interact. Despite this plan, Soman often worked into Mullen's shift and continued to interact with him.

50. On September 9, 2020, Mullen filled a charge of discrimination with the EEOC.

51. On September 22, 2020, Monroe, of the HR Department, informed Mullen that his ADA-related transfer request was denied because there was nowhere within the company to move him.

52. She further stated that the investigation into his allegations – which had initially been made in February 2020 – was complete. She informed Mullen that Soman had been "punished accordingly" and would maintain his position as his supervisor.

53. On September 23, 2020, Mullen sent an email to Monroe and Zickefosse which requested their help in coping with his anxiety.

54. Mullen expressly stated that his mental health felt unstable as a result of the denial of his ADA-related transfer and the trauma caused by the sexual harassment perpetrated by Soman. Monroe advised Mullen to take care of himself and to do whatever was best for him.

55. Mullen responded by specifically stating: "I am asking MSA for help since it was my manager Mitch Soman who sexually harassed and verbally abused myself and others. My ADA was denied to be moved, also my request to be laid off, as also my extension for job protection

with the ADA after FMLA ran out was denied. I am being forced to work with this manager. What is MSA going to do to help me. It is effecting my sleeping, eating and overall function of life."

56. Neither Monroe nor Zickefosse responded to the email.

57. Mullen also sent similar requests for help via email to Defendant's Chief Compliance Officer, Rick Roda, HR Manager, Lori Kaylor, and HR Director, Nina Faber.

58. He received no response.

59. Mullen further contacted the company's ethics hotline to report that the HR Department and management staff had failed to assist in his claims of sexual harassment.

60. On September 24, 2020, Slater, the plant manager, contacted Mullen to inform him that his position was terminated as a result of his inability to comply with the improvements required in his PIP.

## COUNT I
**Hostile Work Environment and Sexual Harassment in Violation of Title VII**

61. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

62. The United States Supreme Court has long held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).

63. In order to show the existence of a hostile work environment, a plaintiff must first demonstrate that he "suffered intentional discrimination because of [his] gender" and that "the discrimination was pervasive and regular." Valenti v. Triangle Circuits of Pittsburgh, Inc., 419 F.Supp.2d 701, 706 (W.D. Pa. 2005).

64. A plaintiff must also present evidence to show that "the discrimination detrimentally affected [him]," and, such treatment "would have detrimentally affected a reasonable person" in the same position. Id.

65. Finally, a plaintiff must show that "there is a basis for respondeat superior liability" on the part of the employer. Id.

66. Here, Mullen suffered intentional discrimination as a result of the offensive and inappropriate comments that were regularly made to him by Soman.

67. These comments were frequently made over the course of a year.

68. Mullen was specifically targeted based on his sex. Soman utilized slurs reserved for homosexual men, as well as terminology which negatively depicted Mullen as gay.

69. The harassment had an extreme impact on Mullen. He felt uncomfortable working with Soman as a supervisor, and he began to experience extreme anxiety as a result.

70. Mullen made numerous reports regarding the conduct, and he frequently asked for help in mitigating the situation. The Defendant's refusal to intervene contributed to Mullen's stress and anxiety.

71. A reasonable person in the same situation would be offended by Soman's language as well as Defendant's refusal to assist in the situation.

72. Mullen was also detrimentally impacted in that his complaints led Defendant is refuse his application for a promotion.

73. Defendant, as an employer, was aware of the harassment lobbed against Mullen. Defendant had a duty to provide Mullen with a work environment free of harassment. Defendant refused to intervene and, as a result, breached its duty to Mullen.

74. The foregoing misconduct by Defendant was undertaken with malice and/or reckless indifference to Mullen's rights protected under federal law to be free from discrimination.

## COUNT II
**Retaliation in Violation of Title VII**

75. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

76. In order to state a *prima facie* case for unlawful retaliation in violation of Title VII, a plaintiff must first show that he "engaged in a protected activity" under the law. McIntosh v. White Horse Village, Inc., 249 F. Supp. 3d 796, 800 (E.D. Pa. 2-17).

77. Next, a plaintiff must present evidence that he "suffered an adverse employment action, and that there was a causal connection between the participation in the protected activity and the adverse action." Id.

78. A plaintiff must further show that engagement in the protected activity was a probable motive for the adverse action. Id. at 801.

79. Here, Mullen engaged in a protected activity when he reported the instances of sexual harassment. He did so on numerous occasions, including:

   a. In in mid-February 2020, Mullen met with Margie Woods, a member of Defendant's HR Department, and reported all instances of harassment made by Soman.

   b. On the same date in mid-February, Mullen met with Defendant's Production Manager, Shane Livingston. and reported that Soman had made inappropriate statements to him.

   c. In April 2020, Mullen met with Michelle Monroe, a member of Defendant's HR Department, and reported all instances of harassment made by Soman. Mullen

       further reported that Soman directed him to work additional hours outside of his scheduled shifts.

   d. On several different occasions, Mullen reported the instances of harassment and the resulting anxiety that he experienced to Defendant's facility nurse, Jackie Zickefosse.

   e. In early August 2020, Mullen he formally filed a grievance with Defendant regarding the sexually-charged comments made to him by Soman.

   f. During an August 11, 2020 meeting with several individuals, including Plant Manager Gail Slater, Mullen, again, disclosed the instances of harassment.

   g. On September 9, 2020, Mullen filled a charge of discrimination with the EEOC.

   h. On September 23, 2020, Mullen sent an email to Zickefosse and members of Defendant's HR Department which requested their help in coping with his anxiety.

   i. Mullen also sent similar requests for help via email to Defendant's Chief Compliance Officer, Rick Roda, HR Manager, Lori Kaylor, and HR Director, Nina Faber.

   j. Mullen further contacted the company's ethics hotline to report that the HR Department and management staff had failed to assist in his claims of sexual harassment.

80. All of these instances constitute engagement in a protected activity.

81. As a result of these numerous reports, Mullen suffered various forms of adverse employment action.

82. Several members of management disclosed Mullen's reports to Soman, resulting in an increasingly hostile work environment. Mullen was mocked for making the reports.

83. Additionally, as a result of Mullen's engagement in a protected activity, Soman added to his workload in an effort to overwhelm him.

84. He was then instructed that he was required to work additional hours outside of his regular schedule.

85. This directive came from the very individual against whom Mullen made the complaints.

86. Mullen's inability to handle the retaliatory workload was what led to his placement on a PIP and, ultimately, his termination.

87. Further, Mullen was not considered for a promotion. Although the open position required only an Associate's Degree, Mullen was informed that he would be required to complete a Bachelor's Degree program in order to be considered for the position.

88. Mullen was also prevented from traveling for work in favor of an employee with less seniority.

89. These acts of adverse employment action all stemmed after Mullen reported Soman's conduct.

90. Prior to making the reports, Mullen had been a successful employee for more than seven years with no issue.

91. The foregoing misconduct by Defendant was undertaken with malice and/or reckless indifference to Mullen's rights protected under federal law to be free from discrimination.

### COUNT III
### Failure to Accommodate in Violation of the ADA

92. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

93. To state a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show:

   a. He was disabled within the meaning of the ADA and the employer was aware of his disability;

   b. He made a request for a reasonable accommodation;

   c. His employer failed to make the reasonable accommodation on a good faith basis; and

   d. The accommodation was reasonable and could have reasonably have been achieved. Dreibelbis v. County of Berks, 438 F. Supp. 3d 304, 316 (E.D. Pa. 2020).

94. Here, Mullen was disabled within the meaning of the ADA as he suffered from extreme anxiety and panic attacks. Defendant was aware of his disability, as Mullen reported it to his supervisors, members of the HR Department, and the facility nurse.

95. Mullen made numerous requests for accommodation, including requesting protected leave through the FMLA, asking to be moved to differing departments, asking to be assigned to a supervisor other than his harasser, and requesting assistance from the Defendant.

96. Defendant refused to meet any of Mullen's requests for accommodation. He was required to continue working for Soman. Although Defendant attempted to change Soman's hours for a brief period, he continued to work with Mullen.

97. Mullen's request for a transfer lagged for several months. While no position was available at the time that Defendant denied his request for accommodation, Mullen could have been moved to an alternative department at the time he requested the transfer.

98. The foregoing misconduct by Defendant was undertaken with malice and/or reckless indifference to Mullen's rights protected under federal law to be free from discrimination.

## COUNT IV
### Retaliation in Violation of the FMLA

99. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

100. In order to prevail on a claim of retaliation under the FMLA, a plaintiff must show that:

    a. He invoked his right to FMLA-qualifying leave;

    b. He suffered an adverse employment decision; and

    c. The adverse action was causally related to his invocation of rights. Lichtenstein v. U. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012).

101. The two main factors relevant with respect to establishing a causal link to satisfy the *prima facie* case of retaliation under the FMLA are: (1) timing and/or (2) evidence of ongoing antagonism. Sabbrese v. Lower's home Center's Inc., 320 F. Supp. 2d 311 (W.D. Pa. 2004).

102. Here, Mullen invoked his right to FMLA-qualifying several times, including in in mid-March 2020 when he took two weeks' worth of leave in order to cope with his anxiety.

103. When Mullen returned to work following his leave, Soman began to harass him regarding his reason for taking leave. Soman stated, sarcastically, to Mullen: "Is your head good? Did you get your head right?" This mocking is evidence of adverse employment actions, as Mullen was harassed and questioned for his protected leave.

104. Another instance of adverse employment action related to Mullen's protected leave arose in April 2020, after he was not asked to travel to North Carolina on behalf of Defendant. Mullen inquired as to why he wasn't asked to go on the trip. Soman stated: "Do you deserve anything here? You can't even come to work." This comment was in reference to Mullen's use of

short-term disability leave through FMLA. Mullen was expressly denied opportunity based on his use of protected leave.

105. The foregoing misconduct by Defendant was undertaken with malice and/or reckless indifference to Mullen's rights protected under federal law to be free from discrimination.

## **PRAYER FOR RELIEF**

WHEREFORE, Mullen respectfully requests that this Court enter judgment in his favor, and against the Defendant, and award all damages available at law and equity, including:

a) Lost back pay resulting from Defendant's wrongful termination of Mullen;

b) Lost front pay continuing into the future for Defendant's unlawful conduct;

c) Compensatory damages, including emotional damages and humiliation;

d) Punitive damages to punish Defendant's conduct and to deter similar future conduct;

e) Costs for bringing this action;

f) Attorneys' fees;

g) Pre-judgment and continuing interest; and

h) Any other relief that this Court deems necessary and proper.

Respectfully Submitted,

/s/ David M. Manes
David M. Manes, Esq.
PA ID: 314661
**Manes & Narahari LLC**
Law & Finance Building
429 Fourth Avenue, Suite 300
Pittsburgh, PA 15219
(412) 626-5571 Direct
(412) 650-4845 Fax
dm@manesnarahari.com

## VERIFICATION

I, Patrick Mullen, swear under penalty of perjury under the laws of the United States of America that the facts alleged in the foregoing Amended Complaint are true and correct to the best of my knowledge.

_____
Patrick Mullen